**RICHARD BEST**
**REGIONAL DIRECTOR**
A. Kristina Littman
John O. Enright
Jorge G. Tenreiro
David H. Tutor
Jon A. Daniels
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | 20 Civ. 8281 |
| -against- | **ECF CASE** |
| **JOHN DAVID MCAFEE and JIMMY GALE WATSON, JR.,** | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint

against Defendants John David McAfee ("McAfee") and Jimmy Gale Watson, Jr. ("Watson")

(collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      McAfee is a businessman and computer programmer with hundreds of thousands of

Twitter followers. From at least November 2017 through February 2018, McAfee leveraged his fame

to make more than $23.1 million U.S. Dollars ("USD") in undisclosed compensation by

recommending at least seven "initial coin offerings" or ICOs to his Twitter followers. The ICOs at

issue involved the offer and sale of digital asset securities and McAfee's recommendations were materially false and misleading for several reasons.

2.      First, McAfee did not disclose that he was being paid to promote the ICOs by the issuers (the companies selling the securities in the ICOs). Promoting a security without disclosing that you are being paid to do so is unlawful "touting" and violates the federal securities laws. The ICOs McAfee touted raised at least approximately $41 million and McAfee made approximately $23.2 million in secret compensation for his touts. When directly asked if he was being paid for these promotions, McAfee lied to investors by falsely denying he was being paid by the issuers.

3.      Second, McAfee falsely claimed to be an investor and/or a technical advisor when he recommended several ICOs, creating the impression that he had vetted these companies, that they were benefitting from his technical expertise, and that he was willing to invest his own money in the ventures. In reality, McAfee's tweets were paid promotions disguised as impartial investment advice.

4.      Third, after a blogger exposed McAfee's paid promotions and he could no longer generate interest in ICOs with tweets, McAfee was still holding a large number of virtually worthless securities from the ICOs he had previously touted. To cash out, McAfee encouraged investors to purchase the securities sold in certain of the ICOs without disclosing that he was simultaneously trying to sell his own holdings and had paid another third-party promoter to tout the securities.

5.      Finally, McAfee engaged in a practice known as "scalping" as to at least one digital asset security, by accumulating large amounts of the digital asset security and touting it on Twitter without disclosing his intent to sell it. Scalping generally allows promoters to sell their securities holdings quickly and profitably through market interest that they deceptively generate, and violates the federal securities laws.

6.      Defendant Watson was McAfee's bodyguard; he also substantially assisted McAfee's touting and scalping schemes. Among other things, Watson negotiated the deals with ICO issuers

seeking promotions, helped McAfee monetize the proceeds of his promotions, and directed his then-wife to tweet fake interest in an ICO that McAfee was promoting at the behest of the issuer.

7.     McAfee was paid bitcoin (BTC) and ether (ETH) worth more than $11.6 million, plus an additional $11.5 million worth of promoted tokens, as undisclosed compensation for his promotions of seven ICOs. McAfee paid Watson at least $316,000 for his role.

## VIOLATIONS

8.     By virtue of the foregoing conduct and as alleged further herein:

a.     Defendant McAfee violated Sections 17(a) and 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)-(b)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)].

b.     Defendant Watson violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; and aided and abetted McAfee's violations of Sections 17(a) and 17(b) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) thereunder, in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

9.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The SEC brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.     The SEC seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting McAfee from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Defendants from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any digital asset security; and (f) ordering any other and further relief the Court may deem appropriate or necessary for the benefit of investors.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged occurred in this District. At least one of Defendants' victims resides in this District, and Defendants converted into USD some digital assets obtained from the ICOs using a service with its principal place of business in Manhattan.

## DEFENDANTS

15.     **McAfee**, age 74, previously a resident of Tennessee, currently resides in an unknown location. McAfee previously served as the Chairman and CEO of MGT Capital Investments, Inc., a publicly traded company, from November 2016 through 2017, and developed the popular anti-virus software that still bears his name. McAfee tweets from the verified[1] Twitter account @officialmcafee, which had approximately 784,000 followers as of February 17, 2018.

16.     **Watson**, age 39, resides in California. Watson began providing personal security for McAfee in late 2017 and worked with McAfee to promote various ICOs during the relevant period.

## RELATED ENTITIES

17.     McAfee and Watson's schemes involved ICO-1, ICO-2, ICO-3, ICO-4, ICO-5, ICO-6, and ICO-7 (collectively, the "Touted ICOs"), offers and sales of digital asset securities, and Token-8, which were offered and sold by the following issuers:

    a.     **Issuer-1** is an unincorporated entity with its principal place of business in Bucharest, Romania. From December 2017 to January 2018, Issuer-1 raised funds in an ICO (ICO-1) for a token (Token-1), purportedly to construct the "first intelligence social marketing platform" powered by smart contracts.

    b.     **Issuer-2** is a U.K. company with its principal place of business in Lagos, Nigeria. From December 2017 to January 2018, Issuer-2 raised funds in an ICO (ICO-2) for a token (Token-2), purportedly to create a system to manage e-commerce businesses.

    c.     **Issuer-3** is a Belizean company with its principal place of business in Las Vegas, Nevada. In early 2018, Issuer-3 raised funds in an ICO (ICO-3) for a token (Token-3), purportedly to create a program to connect contractors directly to consumers.

---

[1] According to Twitter, a "verified account" is "an account of public interest" that is "authentic." *See* https://help.twitter.com/en/managing-your-account/about-twitter-verified-accounts.

d. **Issuer-4** is a Georgia limited liability company with its principal place of business in Atlanta. From January to February 2018, Issuer-4 raised funds in an ICO (ICO-4) for a token (Token-4), purportedly to create a slate of horror films that it would deliver to customers using blockchain technology.

e. **Issuer-5** is a Delaware corporation with its principal place of business in San Francisco, California. In January 2018, Issuer-5 raised funds in an ICO (ICO-5) for a token (Token-5), purportedly to create a background music control application.

f. **Issuer-6** is a Florida limited liability company with its principal place of business in Miami. From January to February 2018, Issuer-6 raised funds in an ICO (ICO-6) for a token (Token-6), purportedly to fund the creation of an application that would permit businesses to share human capital resources.

g. **Issuer-7** is a Virgin Islands limited company with its principal place of business in Moscow, Russia. From December 2017 to January 2018, Issuer-7 raised funds in an ICO (ICO-7) for a token (Token-7), purportedly to create an application that would permit individuals to challenge each other to "dares" for compensation.

h. **Issuer-8** is a U.K. private limited company with its principal place of business in Maidstone, United Kingdom. From September 2017 to October 2017, Issuer-8 raised funds in an ICO (ICO-8) for a token (Token-8), purportedly to fund the creation of a digital asset wallet and cryptocurrency for mobile payments.

### BACKGROUND ON DIGITAL ASSETS AND ICOs

18.    The term "digital asset" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including so-called "cryptocurrencies," "coins," and "tokens." Generally, after being issued, digital assets may be "listed" on online digital asset trading platforms where they can be traded for other digital assets or fiat currency such as USD.

19.     "Issuers" have offered and sold digital assets in fundraising events, called "initial coin offerings" or "ICOs," in exchange for consideration, often other digital assets. The digital assets offered and sold in ICOs may or may not be transferable upon delivery to investors.

20.     ICOs are typically announced and promoted through public online channels. The documents soliciting the public to acquire digital assets in a particular offering are usually in the form of a "white paper," i.e., marketing materials describing the project and the terms of the ICO. To participate, investors may transfer funds to a unique digital address set up by the issuer, and the issuer may deliver digital assets to the ICO participant's unique digital address on a distributed ledger or blockchain. This process may be partially automated through the use of a "smart contract."[2]

21.     Issuers may launch digital assets in ICOs that appreciate in value in the hands of investors. Issuers have also raised millions of dollars in fraudulent ICOs.

22.     On July 25, 2017, the SEC issued the "DAO Report of Investigation," where it noted that digital assets sold in ICOs may be securities subject to the federal securities laws.[3]

23.     On November 1, 2017, the SEC's Division of Enforcement and Office of Compliance Inspections and Examinations issued the "SEC Statement Urging Caution Around Celebrity Backed ICOs" ("Celebrity ICO Statement"), which noted that, in accordance with the anti-touting provisions of the federal securities laws, "[a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion."[4]

---

[2] Blockchains or distributed ledgers can record what are called "smart contracts," which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

[3] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Exchange Act Rel. No. 81207 (July 25, 2017).

[4] The Celebrity ICO Statement is available at: https://www.sec.gov/news/public-statement-statement-potentially-unlawful-promotion-icos.

## FACTS

### I.    BACKGROUND

24.    During the course of 2017, the trading price of one bitcoin (BTC) rose from approximately $1,000 to $20,000 USD on certain digital asset trading platforms.

25.    Against this backdrop, on July 17, 2017, McAfee predicted on his official Twitter account that the price of BTC would reach $500,000 by the end of 2020. On November 29, 2017, also on Twitter, McAfee raised his predicted price of BTC to $1 million USD per BTC by the end of 2020, purportedly according to a "model."

26.    McAfee's extravagant posts (such as tweeting predictions about BTC price increases and promising to "eat my d**k on national television" if such predictions did not pan out) and interviews about his BTC predictions generated an enormous amount of publicity, especially among the digital asset community. From June 2017—just before McAfee's first BTC price prediction—to December 2017, McAfee went from roughly 62,000 followers to more than 500,000 on Twitter. His $1,000,000 BTC price prediction garnered more than 12,000 "Likes" and 8,000 "Retweets."

27.    As McAfee gained fame in the digital asset community, ICO issuers began contacting him through Twitter direct messages (DMs), and later through at least one dedicated email address (first tweeted out by McAfee and later managed by Watson at McAfee's direction), to ask McAfee to promote their upcoming digital asset offerings.

28.    Years later, McAfee admitted that his statements regarding his predicted price of BTC were merely a "ruse" intended to "onboard new users."

### II.    THE ICO TOUTING SCHEME

29.    Beginning in at least November 2017, McAfee (and later Watson) privately told ICO issuers that McAfee would promote their offerings and that they could list McAfee as an adviser if they gave McAfee a percentage of the digital assets being offered and/or payments in BTC.

30.     McAfee typically interspersed promotional tweets with warnings about other digital assets that he was not promoting or otherwise discussing. For example, on December 22, 2017, McAfee tweeted that "Yes, there are 1,500+ coins now. And yes, most are jokes or outright scams. But among those coins are . . . proven winners."

31.     In a December 28, 2017 interview, conducted and posted by a website targeted at the digital asset community, and available on YouTube (the "December 2017 Interview"), McAfee similarly warned ICO investors—in the context of distinguishing his own ICO recommendations— that "you need to be very, very careful because there are so many scams, so many people that are trying to steal [from] you that it's a dangerous thing."

32.     By contrast, McAfee would typically refer to the ICOs he was promoting as investments from which investors could profit. For example, in the December 2017 Interview, McAfee stated that "if you want to get in at the ground floor, meaning you will get it cheaper—in other words, no one will get in cheaper than you because you're buying it at the offering price; it can only go up—then start looking at ICOs, initial coin offerings."

33.     After the success of his initial ICO promotions, McAfee began demanding an up-front payment in BTC in addition to a percentage of the digital assets offered in the ICOs, and, later, a percentage of the total funds raised from investors in the offerings themselves, arguing that the supposed success of certain offerings was due to his involvement.

34.     Because his own compensation was tied to the fundraising success of the ICOs he was promoting, McAfee frequently urged investors to buy the touted tokens quickly and hold them for the long term. For example, in response to questions about the nature of his ICO holdings in a January 10, 2018 interview (the "January 2018 Interview"), McAfee responded, "If I truly believe that they're the coins of the future, wouldn't it make sense to hold on to them for a couple years? What madman would take a 100 percent gain over taking 10,000 times that?"

35.     Tables 1-3 set forth the compensation that McAfee received with respect to, and the approximate number of tweets he made about, each Touted ICO. McAfee did not disclose any of these payments to investors in connection with his promotional tweets for the Touted ICOs at the time he was making the touting statements and the ICOs were ongoing.

| Table 1: McAfee ETH Payments for the Touted ICOs | | | | | |
|---|---|---|---|---|---|
| ICO | First Payment | Total # of Tweets | Total ETH Raised in ICO | Total ETH Paid to McAfee | USD Value Upon Receipt |
| ICO-1 | 12/20/2017 | 11 | 23,741 ETH | 5,792 ETH | $6,107,570 |
| ICO-2 | 1/2/2018 | 3 | 10,144 ETH | 2,953 ETH | $3,116,256 |
| ICO-3 | 1/8/2018 | 3 (1 deleted) | 830 ETH | 449 ETH | $558,403 |
| ICO-4 | 1/9/2018 | 1 (deleted) | 125 ETH | 45 ETH | $57,997 |
| ICO-5 | 1/16/2018 | 5 | 2,027 ETH | 412 ETH | $428,495 |
| ICO-6 | 1/19/2018 | 3 | 547 ETH | 110 ETH | $110,130 |
| ICO-7 | 1/30/2018 | 14 | 2,655 ETH | 728 ETH | $669,944 |
| **Total:** | | | | | **$11,048,795** |

| Table 2: McAfee BTC Payments for the Touted ICOs | | | |
|---|---|---|---|
| ICO | First Payment | Total BTC Paid to McAfee | Value Upon Receipt |
| ICO-1 | 12/21/2017 | 43 BTC | $619,465 |
| ICO-3 | 12/12/2017 | 1.445 BTC | $24,633 |
| **Total:** | | | **$644,098** |

| Table 3: McAfee Token Payments for the Touted ICOs | | | |
|---|---|---|---|
| ICO | Number of Tokens | ICO Price per Token in USD | Approximate Value in USD |
| ICO-1 | 2,003,956 | $2.46 | $4,929,731 |
| ICO-2 | 14,505,050 | $0.45 | $6,527,272 |
| ICO-3 | 1,500 | $0.192 | $288 |
| ICO-7 | 1,780,000 | $0.03 | $53,400 |
| **Total:** | | | **$11,510,691** |

36.     McAfee and Watson ultimately transferred the BTC and ETH that McAfee received in connection with this scheme to digital asset wallet services and digital asset trading platform accounts in McAfee's and Watson's names and in the names of other individuals in McAfee's employ, which accounts McAfee and Watson directly or indirectly controlled.

37.     For example, McAfee and Watson transferred more than $1 million USD in digital assets to a digital asset trading platform located in this District, where the digital assets were converted to USD by Watson's then-wife at McAfee's and Watson's direction. Watson's then-wife then sent the money to bank accounts controlled directly or indirectly by McAfee and Watson.

38.     From these transfers, Watson received approximately $316,000 in payment for his participation in this scheme.

39.     On February 8, 2018, a blogger accused McAfee, in a lengthy, public post purporting to contain irrefutable evidence of its accusations, of receiving undisclosed compensation for touting ICOs and suggested that readers contact the SEC. As a result, a correspondent for one of the Touted ICOs asked Watson to help the issuing company formulate a response.

40.     In response, on February 11, 2018, McAfee disclosed that he was being paid for some of his promotions of ICOs, though even in that post he continued to make materially misleading statements about the nature and extent of his involvement with the ICOs.

41.     Until February 11, 2018, McAfee had never disclosed that he was being paid for his promotion of multiple ICOs.

42.     Even after February 11, 2018, McAfee made additional, materially misleading statements about certain ICOs he had been promoting.

43.     McAfee and Watson were located in the United States when they made many of the promotional tweets for the Touted ICOs.

44.     Investors in the United States could and did buy tokens in the Touted ICOs.

**A.      McAfee Unlawfully Promotes the Touted ICOs and Misleads Investors About His Involvement with the ICOs**

45.     From at least November 2017 through February 2018, McAfee touted the seven Touted ICOs through at least forty tweets and replies, some of which are set forth below.

46.     As he admitted during the January 2018 Interview, McAfee was aware that his tweets had a significant impact on the prices of the Touted ICOs and that the true nature of his relationship to the issuer was of critical importance to investors.

47.     In that interview, McAfee misleadingly highlighted another recent promotion as an example of him supposedly being honest with the public, stating: "[I]f you look at that tweet today, I said oh yeah, I shamelessly am saying this is something that I was involved in. So I let you know so you can take it with a grain of salt because I'm involved. But if I don't tell you, I'm not involved."

48.     In reality, McAfee had falsely and misleadingly stated that he was an adviser to the issuer of that token instead of disclosing the truth: that he was a paid promoter and nothing more.

49.     Further signaling the importance to investors of knowing whether McAfee was being compensated for his endorsements of ICOs—that is, whether McAfee's recommendations were biased—investors repeatedly replied to McAfee's ICO-endorsement tweets to ask whether he was being paid for his promotions.

50.     As more fully alleged below, in responses to these questions McAfee affirmatively lied to and misled investors about whether he was receiving compensation for the touts.

51.     For example on December 15, 2017, McAfee highlighted the purportedly unbiased nature of his recommendations on Twitter in a reply to a user who had tweeted "Paid post?" in response to McAfee's recommendations. McAfee replied: "Get fucking real. There is no amount of money that could make me say something I do not believe, or something I think may not happen."

52.     McAfee also explicitly denied his role as an ICO promoter in the December 2017 Interview, where he stated:

> Now, I'm not saying that I've not tweeted out coins that I am invested in, but when I do, I tell everybody. If I say this is a great coin and nothing else, I promise you I don't own any of it, I am not affiliated with it, and I'm not interested in whether or not you buy it. What I'm interested in is educating the public about what is available.

12

53.     These statements were false or misleading when McAfee made them because, as he knew or recklessly disregarded, he was, in fact, being compensated for touting the Touted ICOs.

54.     As more fully alleged below, McAfee made additional false and misleading statements to potential investors about his involvement with some of the ICOs he was touting. For example, he publicly and falsely claimed that he was providing advisory services to some issuers' business operations, while simultaneously confirming in private messages that he provided no actual assistance to the Touted ICOs other than his promotions of the ICOs themselves.

55.     In a private Twitter conversation, a correspondent informed McAfee that he was buying into his first ICO, to which McAfee responded: "What's the ICO? I've partnered with a number of ICOs. They use my name and my participation in marketing materials in exchange for a substantial percentage of the coins. It feels like I'm stealing from them by getting paid for doing nithing [sic] . . . ."

56.     When another correspondent privately approached McAfee in December 2017 about McAfee serving as an adviser to the company's business, McAfee responded: "Not interested. I have no time to sell. If you want to use my name we can discuss."

57.     As more fully alleged below, McAfee also publicly and falsely claimed that he personally invested in certain ICOs he was promoting, boasting how much money he was making from investing in digital assets (thus misleading investors into thinking that he was making money from identifying and investing in ICOs he believed were worthwhile) when, in reality, he was making no such investments—he was being paid for the promotions.

58.     For example, McAfee personally appeared in a rap music video that he posted to his Twitter account in January 2018, shortly after the end of his promotion of ICO-1, called "The McAfee Effect," which included the lyrics: "Pickin ICOs that's a . . . cash vault."

### 1.    McAfee's ICO-1 Tout

59.    On December 17, 2017, approximately three days after the start of ICO-1, the founder of ICO-1 (Founder-1) contacted McAfee to ask him to promote ICO-1, stating: "We do not want to loose [sic] ourselves in the ocean of ICOs and we need your help for that."

60.    On December 19, McAfee replied that in exchange for 10 BTC and "a substantial percentage of issued tokens," McAfee would, among other things, "tweet reasonable numbers of tweets, which have a huge impact on the Cryptocurrency market."

61.    Founder-1 replied to McAfee that Issuer-1 would "pay 10 BTC" for McAfee's promotion of ICO-1, but that Issuer-1 had not yet raised funds sufficient in ICO-1 to make such a payment. Founder-1 instead proposed that he give McAfee daily payments amounting to 30% of the total funds raised in ICO-1. McAfee agreed to promote ICO-1 on these terms.

62.    On December 20, McAfee began his promotion of ICO-1 by tweeting from his official Twitter account that Token-1 was "[t]he first token to open the door to a new paradigm of social marketing" and was "a world changing coin and a world changing concept."

63.    Also on December 20, Watson's then-wife tweeted a question to McAfee about ICO-1 at the direction of McAfee and Watson. Seeking to increase the supposed allure of his recommendations, McAfee publicly reply-tweeted that his "recommendation for [ICO-1] is for experienced crypto investors only." Despite his statement that ICO-1 was for "experienced" investors only, McAfee quickly and soon thereafter directed another potential investor who replied in the same twitter thread to ICO-1's website, where the sales of Token-1 were ongoing.

64.    On December 22, in a public reply to a user commenting on McAfee's first promotional tweet about ICO-1, McAfee insisted that "implying [Token-1] is a joke is a huge mistake. Go to [Issuer-1's website] and read it. You will see it is in the mold of a winner."

65.     As McAfee began tweeting about ICO-1, Issuer-1 concurrently began promoting that McAfee was the issuer's main adviser and posted his picture on its website. McAfee initially falsely created the impression that he was lending his expertise to the company, stating in replies to questions posted by other users in response to his promotional tweets: "I am making sure that their cyber security is perfect. Hackers are targeting coins as easy money these days." McAfee knew or recklessly disregarded the fact that he was not providing any cyber security guidance to ICO-1.

66.     On December 20, in furtherance of his efforts to promote ICO-1 and Token-1, McAfee also falsely tweeted that "[he] urged [Issuer-1] to let [him] assist" with ICO-1, when in fact, as McAfee knew or recklessly disregarded, Founder-1 had sought McAfee's promotional assistance and McAfee was not "assisting" the company other than by making promotional tweets.

67.     Later, on December 20, after McAfee confirmed to Founder-1 that he had received his first payment for the promotion of ICO-1, McAfee coordinated with Founder-1 to further increase the impact of his promotion by falsely disclaiming any connection between himself and ICO-1. McAfee instructed Founder-1 that "for the next few weeks, take my name off your site. I want to be able to leverage my Twitter with people assuming I have no relationship with you. Removing my name now will add at least a million dollars to your sale."

68.     On December 20, McAfee tweeted that while he could not guarantee the success of Issuer-1, he could "guarantee that [he saw] no better ICO than [ICO-1] at the current time."

69.     On December 21, McAfee publicly reply-tweeted: "If . . . you don't mind holding a coin for a couple of months then [ICO-1] is the best ICO out there," and tweeted: "For those of my trolls who call everything that I recommend a shit coin -- please read [ICO-1]'s white paper. It is brilliant. [ICO-1] is also the first social marketing coin. Its potential could equal the success of Twitter. So troll elsewhere or wise up and buy [ICO-1]."

70.     In a continued effort to ensure that more investors bought into ICO-1, whose tokens could not at that time be resold on digital asset trading platforms, on December 24, McAfee tweeted: "For everyone who has DM'd me about [ICO-1]: It is an ICO. You can't buy it one day and sell it the next. It is a longer term play. Wait for the ICO to finish and get listed on exchanges. You must wait, but the returns will be way better. I explained this in my original tweet."

71.     On December 27, McAfee falsely reply-tweeted publicly: "[ICO-1] is also a great ICO opportunity. . . . I have personally purchased a significant amount i[n] [ICO-1] . . . ." McAfee knew or recklessly disregarded the fact that he had made no such investment in ICO-1.

72.     McAfee also repeatedly promoted ICO-1 during the December 2017 Interview, noting that "one of the reasons [he] like[d] [ICO-1] so much" is that "[t]he potential for growth is tremendous," predicting that "[i]f that thing does not go up by a factor of 50 in the first year [he'd] eat [his] shoe," and promising "it's going to make you more money than anything you can invest in."

73.     During the December 2017 Interview, McAfee further and falsely claimed that he was touting ICO-1 solely due to its merits and its benefits to society: "So people go . . . , 'Why are you promoting this?' Because it is good for the world. It is good for you. It is good for everybody."

74.     On January 8, 2018, McAfee falsely announced on his Twitter feed that he had "taken a formal advisory role in [ICO-1]. I heavily invested in [ICO-1], so I have a personal interest in helping ensure that product development is properly done in a timely manner."

75.     In an attempt to further induce investors to buy into ICO-1, on January 13, McAfee tweeted: "[ICO-1] is closing its pre-sale at 1:00 PM on January 15th. Last chance at 40% bonus. Disclaimer . . . I am an advisor and investor of [ICO-1]."

76.     McAfee knew or recklessly disregarded that these statements were false or misleading when he made them, because in fact, McAfee never had a "formal advisory role" with or provided cyber security advice to Issuer-1, and because McAfee never purchased any Token-1 securities;

rather, McAfee only owned Token-1 securities because the issuer had issued them to him as compensation for his promotions.

77.     In the replies to McAfee's initial promotional tweets about ICO-1, Twitter users directly asked McAfee if he was receiving compensation to promote ICO-1. McAfee replied to these questions falsely: "I do not. I merely sift through the mass [of] tokens to find the gems and share them. It's in everyone's interest to support coins that improve our lives."

78.     Another Twitter user replied to one of McAfee's tweets about ICO-1 stating that "[t]he money goes right into John's pocket," to which McAfee misleadingly publicly replied, he "[w]ish[ed] it did." McAfee knew or recklessly disregarded these statements were false or misleading as he was, in fact, being compensated for the promotional statements and did not sift through tokens to "find" ICO-1 but, instead, had been contacted by Founder-1 to promote ICO-1.

79.     McAfee's false statements on Twitter about ICO-1 were important to investors considering whether to invest in ICO-1. For example, one commenter on a digital asset discussion forum stated that "[a]dding JM [John McAfee] best strategic move I have ever seen an ICO do" because it demonstrated that the company was "getting accredited by people in the industry," which would "get people to believe in it more." Others noted that ICO-1 was an "[i]nteresting project and if John McAfee said what he said I'm in," or that McAfee "has had success in other ICO[s] as well and believes in this product."

80.     Token-1 tokens were sold in ICO-1 for 0.003 ETH per token, with additional tokens provided as a "bonus" depending on when the investor invested. Today, Token-1 no longer trades on digital asset trading platforms, and thus has little to no value.

## 2.     McAfee's ICO-2 Tout

81.     On January 1, 2018, McAfee tweeted: "ICO of the week: [ICO-2]. [Issuer-2] is a distributed version of Amazon.com. [I]t allows simple and secure creation of e-commerce sites –

searchable in the same manner as Amazon – but with no Amazon as middle man. This could be as huge as it gets in the blockchain world." Also on January, in reply to a response to this tweet, McAfee said: "You buy by clicking [link to the "crowdsale" page on ICO-2's website]."

82.     On January 3, McAfee reply-tweeted: ". . . [ICO-2] will likely replace Amazon.com. It is the first distributed version of Amazon. If you cannot see the value of a distributed version of Amazon - without the cost of goods increased by the middleman (Amazon) then I'm sorry."

83.     On January 6, McAfee tweeted: "I have become an advisor to [ICO-2]. I recommended them recently and, as an early investor in their ICO, I want to make sure they succeed in implementation. I love Amazon,com [sic], but I want everyone to have the ability to be their own Amazon if they want to start an e-business."

84.     McAfee knew or recklessly disregarded that this statement was false or misleading when he made it because McAfee was being secretly paid for these promotions, he never had an advisory role with Issuer-2, and his only holdings related to ICO-2 were not the result of his investment, but instead had been paid to him by the company as compensation for his promotions.

85.     Issuer-2 sold 1,929 tokens in ICO-2 for 1 ETH, or approximately $0.45 per token as of January 2, 2018. Today, Token-2 trades for approximately $0.003338 on digital asset trading platforms, and are essentially worthless.

### 3.     McAfee's ICO-3 Tout

86.     On December 7, 2017, a representative of Issuer-3 contacted McAfee by Twitter DM to ask if McAfee "[w]ould . . . consider being an advisor for [Issuer-3]."

87.     McAfee responded by asking whether Issuer-3 had a white paper, and stating that he "require[d] a sign on payment plus a percentage of the tokens."

88.     The representative responded to McAfee that he could "give [McAfee] $25,000 USD in BTC as a retainer up front/right now and then more BTC after [its] pre-sale and a large amount

after the ICO for a total of $1,000,000 USD worth of BTC." The representative also stated that he would give McAfee "a portion" of the tokens that had been reserved for the Issuer-3 "founders' pool," and that the white paper was "in draft mode" so he could not provide it to McAfee.

89.     McAfee, having not seen the ICO-3 white paper, nevertheless replied: "When I receive the $25,000 I will announce my involvement and begin promoting you. You are correct – my involvement will double your sales at the very least."

90.     On December 12, Issuer-3 sent McAfee BTC worth approximately $24,633.

91.     On December 13, McAfee tweeted: "The skilled trade market . . . has enormous middle man overhead – costing consumers billions each year. [Token-3] decentralizes this market using smart contracts. Disclaimer – these folks are friends of mine – but brilliant friends."

92.     McAfee highlighted the influence of his promotions in a private message to a representative of Issuer-3 on December 14, saying that his tweet from the previous day had been seen 86,903 times, and had 3,085 "interactions" (i.e., generated clicks, replies, likes, and other actions by readers) with the tweet.

93.     On December 19, McAfee tweeted: "One of the most interesting brick and mortar ICOs I've seen. Shout out to [ICO-3]. Note: These folks are friends of mine."

94.     On January 6, 2018, which was one of the first days of the ICO-3 offering, McAfee tweeted: "ICO of the week: [ICO-3]. Disclaimer: I am an investor and fan. Already has more than 50,000 customers matched with home repair pros and their growth is stunning. Removes middlemen, reduces fraud, slashes cost. Who wouldn't want a piece of [Issuer-3?]"

95.     In fact, as McAfee knew or recklessly disregarded, he had never invested in ICO-3, and was not "friends" with its issuer. The only assets McAfee received in connection with ICO-3 were not the result of his investment, but were paid to him as compensation for his promotion.

96.     On January 7, McAfee privately messaged the representative of Issuer-3 saying that his January 6 tweet had 480,470 "Impressions" and 32,409 "Total engagements" on Twitter.

97.     Also on January 7, 2018, McAfee sent an ethereum wallet address to the representative of Issuer-3 to receive the ETH payments for his promotion of ICO-3.

98.     On January 11, the representative of Issuer-3 received a Twitter DM from McAfee's official Twitter account, signed by Watson as "Executive Advisor," stating:

> Mr. McAfee has decided to discontinue promoting your ICO. The daily payments have been insignificant compared to the other ICOs that he is promoting. Since there are a limited number of tweets that he can do each week and have the tweets remain effective, he believes, from a business standpoint, it makes more sense to tweet an ICO that is performing at least closer to average return. There is no need to transfer any more funds. Mr. McAfee and the team wish your ICO all the best. Thank you.

99.     McAfee subsequently deleted his January 6, 2018, tweet concerning ICO-3.

100.    Token-3 tokens were sold in ICO-3 for 6,000 tokens per 1 ETH, or approximately $0.192 per token as of January 7, 2018. Today, Token-3 trades for approximately $0.0017, and are thus essentially worthless.

### 4.    McAfee's ICO-4 Tout

101.    On December 31, 2017, a representative of ICO-4 emailed McAfee to retain him to promote ICO-4, and on January 1, 2018, noted that Issuer-4 hoped to raise 6,900 ETH, worth approximately $5 million USD, which would allow them to make horror films, the intended purpose of the company, and proposing to give McAfee 30% of the amount raised.

102.    The representative further discussed how McAfee could profit from the company's digital assets if he promoted ICO-4, but noted: "Of course I can't mention any of this in our whitepaper since the SEC views mentioning even the smallest hint of profit as a qualifier to deeming a token a security, but I've added enough for an experienced investor to read between the lines."

103.     On January 1, McAfee replied: "With my help you will quickly generate 6,900 Ether. You might consider upping it to at least 9,000 +."

104.     The Issuer-4 representative replied to McAfee: "The smart contract we are using has a hard cap of about 50,000ETH if we were to give you 40% of the supply of tokens. . . . My offer to you is 40% of the tokens, and 30% of the ICO take. Paid daily." McAfee replied "[a]ccepted," and forwarded the correspondence to Watson.

105.     On January 7, Watson replied to the email chain, representing himself as McAfee's "Exec Advisor" and asking the issuer to call his "office phone to discuss further details . . . ."

106.     On January 8, after arranging a call between the representative of Issuer-4 and McAfee, Watson, acting at McAfee's direction, reconfirmed by email to Issuer-4 the promotional agreement "for the deal of 40% tokens and 30% per day for the duration of [ICO-4]."

107.     McAfee then tweeted: "2nd Weekly ICO choice: [ICO-4]. I couldn't resist. [Token-4] fuels financing and distributing horror films. It takes power from the boardroom and gives it back to the filmmakers - hopefully encouraging creativity. I love horror films and will invest." As McAfee knew or recklessly disregarded, he had no intention of investing in ICO-4, but was falsely tweeting that he would because Issuer-4 had paid him to promote the token.

108.     McAfee subsequently deleted his tweet concerning ICO-4. On January 20, the representative of ICO-4 wrote to McAfee by email: "A few members of our community noticed you had deleted the [Issuer-4] tweet. Are there any issues?" Watson replied: "Unfortunately, your ICO is not doing as well as ICOs Mr. McAfee has promoted in the past. We are discontinuing the promotion at this time."

109.     Token-4 tokens were sold in ICO-4 for approximately $0.114 per token as of January 8, 2018. Today, Token-4 trades for approximately $0.000212, and are thus essentially worthless.

### 5. McAfee's ICO-5 Tout

110.    On January 15, 2018, Watson, acting at McAfee's direction, sent a representative of Issuer-5 a digital wallet address controlled by McAfee and said: "Mr. McAfee will begin promoting your ICO very shortly. 24 hours after his first tweet, a payment of 25% of ICO income should be sent on a daily basis."

111.    McAfee then tweeted: "Second ICO of the Week: [ICO-5]: [link to ICO-5 Website]. Will likely replace Spotify and become the virtual jukebox for businesses. . . . Love this one."

112.    On January 19, McAfee tweeted: "[Issuer-5] reached its soft cap today. Congratulations," and posted a link to the ICO-5 offering website.

113.    On January 20, McAfee tweeted: "[ICO-5] seems on track. A goid [sic] investment for the ICO adherents among you," and posted a link to the ICO-5 offering website.

114.    On January 22, McAfee retweeted a tweet by his own spouse regarding her purported investment in ICO-5 and said: "It's a sound investment and the [Issuer-5] team would have to fuck up royally not to succeed . . . ."

115.    On January 26, McAfee tweeted: "[Issuer-5] on track to reach its hard cap," and posted a link to the ICO-5 offering website.

116.    Token-5 tokens were sold in ICO-5 for 70,000 tokens per 1 ETH, or approximately $0.018 per token as of January 15, 2018. Today, Token-5 trades for approximately $0.00011, and are thus essentially worthless.

### 6. McAfee's ICO-6 Tout

117.    On January 14, 2018, Watson, acting at McAfee's direction, wrote to a representative of Issuer-6, who had previously reached out to a McAfee-controlled email address:

> Mr. McAfee just finished two ICOs that he was advising and is available as an advisor. If you are interested, he charges 25% of the ICO income, paid daily, and a percentage of the coins. He will only work with ICOs that use reputable Crowd funding sites so that he is assured the daily income counter

> is correct. If you meet these guidelines, he might be able to help advise you.
> He would also require the time necessary for your site to be audited, to
> ensure that he is not recommending a questionable company. Thank you.

118.    On January 15, Watson, again at McAfee's direction, wrote to the representative of

Issuer-6: "If you can provide evidence of having a way to show proof of daily ICO income, Mr.

McAfee can begin his first promotional tweet tonight. Please keep in mind, 25% of your ICO daily

income is required every day of your ICO sale. Generally, he also takes a percentage of coin . . . ."

119.    The representative of Issuer-6 agreed to these terms, and wrote to Watson: "Since

Mr. McAfee will become an advisor, I have two final questions. 1) can we add him to our website

now? 2) how do we reach him in case we have a question?"

120.    Watson replied:

> Mr. McAfee has requested that you wait until two days after his first tweet to
> place his name on your website. There is a reason for everything. Please
> provide exact date of your ICO start date, or has it already begun? Whatever
> the answer, Mr. McAfee's timing, method, and tweets is [sic] designed to
> promote your ICO to its max potential. If we are in agreement please
> confirm start date and Mr. McAfee will send his first tweet shortly. I am
> sending his Etherium [sic] address in next email. The 25% will be due
> 24hours [sic] after his first tweet.

121.    On January 17, McAfee tweeted: "Want to park your money in a safe place that may

have great upside? ICOs are King in this market . . . Be sure to fully read the white papers and check

out carefully. I'm considering [ICO-6]," and posted a link to ICO-6's website.

122.    On January 18, McAfee tweeted: "Audit of the [ICO-6] which I recommended

yesterday. It should answer the many questions about [Issuer-6] which I received," and included a

link to a supposed audit of ICO-6.

123.    On January 24, in response to questions in his replies on Twitter about whether he

was compensated for his tweet touting ICO-6, McAfee wrote:

> Why does everyone assume I fucking get paid for everythings [sic] I tell
> people to check out??????? Can't I fucking point out items of interest? Why

the fuck do I need money. Google me. And it's fucking rude to ask peopler
[sic] what they make. How much do you make at your work??"

124.    In fact, at this time McAfee had already begun receiving payments from ICO-6,
which ultimately totaled approximately $110,130 USD worth of ETH.

125.    On January 24, McAfee falsely and misleadingly tweeted that he had chosen ICO-6
to recommend for investment because of "the potential value of the coin" that supposedly "could
make [ICO-6] a giant," when, in reality, and as he knew or recklessly disregarded, he had not chosen
ICO-6 for investment, but, rather, was being paid to promote the ICO.

126.    Token-6 tokens were sold in ICO-6 for 3,000 tokens per 1 ETH, or approximately
$0.338 per token as of January 17, 2018. Today, Token-6 no longer trades on digital asset trading
platforms, and has little to no value.

### 7.    McAfee's ICO-7 Tout

127.    On January 29, 2018, McAfee tweeted: "A fascinating ICO – [ICO-7]. Combines
social media with physical action. They already have 1.2 million users. A combination of MTV,
Jackass and viral videos, it allows users to challenge each other to perform any act . . . ," referring to
the supposed purpose of the fundraise for ICO-7.

128.    On January 29, McAfee also tweeted: "We found out that [ICO-7], the ICO I talked
about earlier today, has both an Android and IOS app. We have been using it all afternoon. This iis
[sic] some fun shit. Try it yourselves. Just one more reason I believe this coin is going to fly."
McAfee subsequently posted additional tweets about his use of the Issuer-7 app.

129.    On January 31, McAfee tweeted: "[ICO-7] is performing well. The token price is
going up 50% tomorrow. If you invest in ICOs you should check this one out before tomorrow."

130.    In a reply to his January 31 post, McAfee continued to urge readers to invest in ICO-
7: "An ICO is an initial coin offering. You buy the Coin before it is listed on an exchange. More
often than not the early buy in returns far more than buying the Coin on an exchange."

131.    On February 5, McAfee tweeted: "[ICO-7] is undervalued right now. In the next 2 years this project will disrupt the gaming and entertainment market which is a $100 billion dollar opportunity—a gem of information . . . ."

132.    An ICO-7 "cold storage" wallet address (a device or software used to store digital assets offline) made nine direct ETH transfers to McAfee, on a daily basis from January 30 through February 7, 2018, as payment for his promotions.

133.    Token-7 sold for between approximately $0.02 and $0.04 during ICO-7. Today, Token-7 trades for approximately $0.000424, and is thus essentially worthless.

**B.    McAfee Continues to Deceive Investors About His Role in the Touted ICOs After His Touting Scheme Is Uncovered**

134.    On February 8, 2018, a blogger on an online messaging board posted a message ("the February 8 Post") speculating about McAfee's relationship to ICO-7, noting that: (a) ICO-7 had raised less than 10% of its funds from the beginning of the ICO around December 25, 2017, to before McAfee's first promotional tweet on January 29, 2018; (b) interest in the ICO had increased substantially after McAfee's series of tweets in the week following January 29, 2018; (c) prior to January 29, 2018, investors could use six forms of payments to invest in ICO-7 but that on that date all funds started flowing into a consolidated Ethereum address; (d) McAfee had been announced as an "advisor" to ICO-7 on January 30; and (e) the consolidated address, which had been made public by the team behind ICO-7, had made several large transfers of the funds raised to one single wallet.

135.    The team behind ICO-7 had in fact announced that all of the ETH raised would be transferred to a single "cold storage" wallet, supposedly due to the potential risk of hacking.

136.    Based on the foregoing, the author of the February 8 Post argued that McAfee took what had been an unsuccessful project and pumped it to unwitting investors for undisclosed compensation, concluding "that the transactions [of ETH transfers] were a reward for advertising by McAfee," and that McAfee's actions were "a good reason to write . . . to SEC [sic]."

137.     Indeed, the nine consecutive transfers to McAfee from the "cold storage" ICO-7 wallet address (all made after McAfee's promotions began) were both easy to trace and difficult to explain, as McAfee had not disclosed that he was being compensated for his promotion of the ICO-7, while it was apparent that payments from the ICO-7 issuer's "cold storage" wallet were being sent to a single digital asset immediately after McAfee's promotion began.

138.     On February 9, a member of the ICO-7 team forwarded a link to the February 8 Post to Watson, asking him to coordinate a response with McAfee, noting people would "become suspicious if we . . . remain silent for a long time."  Watson forwarded the email to McAfee.

139.     On February 11, McAfee issued a statement on Twitter entitled "The McAfee Team and ICOs," where he for the first time admitted that he was being paid for promotions, while repeating his false claims that his team reviewed and picked the "best" ICOs for his "recommendations," and that he was offering "advice" (in addition to promotional services) to the issuers. The statement refused to disclose how much McAfee charged for his "services" claiming "[i]t is no one's business other than ours and the companies we support."

140.     McAfee knew or recklessly disregarded that these statements were false or misleading when he made them, including because his team did not "pick" the ICOs for his recommendations and because he did not offer "advice" beyond promotional services to the ICO issuers.

141.     Following the February 8, 2018 blog post accusing McAfee of receiving undisclosed compensation and McAfee's February 11, 2018, statement, fewer issuers contacted McAfee to promote their ICOs and the impact of his touts receded considerably.

**C.     McAfee's Scheme to Cash Out of Proceeds Earned from the Touted ICOs**

142.     After he was forced to disclose his compensation arrangement with the ICO issuers he had been promoting and his promotional efforts became ineffective, McAfee was left with millions of the digital assets that he had received as payment for his earlier touts.

143.    Although these digital assets had been worth millions of dollars around the time of the ICOs, by March 2018 they were worth a fraction of that amount.

144.    To unload these digital assets, McAfee orchestrated a scheme of paying a separate promoter to tout the same tokens offered in the Touted ICOs without disclosing the arrangement.

145.    In February 2018, McAfee had recognized that "bots" had been spamming his Twitter posts and appropriating his identity on social media, and had hired an individual using the Twitter handle @McAfeeclones to target and attempt to remove these online bots.[5]

146.    Later, McAfee used @McAfeeclones' bots to promote the tokens he had previously touted to increase the price of these tokens so that he could sell them at inflated prices.

147.    On March 3, 2018, McAfee sent a private Twitter DM to @McAfeeclones explaining that he and his team had been recommending an ICO once or twice a week. McAfee wrote: "When we do a promotion, I need someone who is a member of the major crypto trading blogs on the various platforms to help us with outr [sic] promotion."

148.    McAfee explained that he wanted @McAfeeclones to:

    1 . . . [F]ind the largest or most influential blogs, chat boards, social media groups, etc. in the realm of crypto investing, crypto trading, crypto promotion, ICO discussion groups, etc. 2. Join these groups and start interacting with existing members. Do not mention ne [sic] or prom9te [sic] anything at all until -- 3. I give you an ICO or existing coin to promote. I will write your promotional posts for you for the first few months.

149.    On March 6, McAfee instructed @McAfeeclones to promote the two digital asset securities that constituted McAfee's largest holdings from the ICO promotion scheme: Token-1 and Token-2. @McAfeeclones then began "promoting every day in various groups."

---

[5] A "bot" is a software application that runs automated tasks (scripts) over the Internet.

150.     These promotions were successful in increasing the price of these assets. Less than a week into this new scheme, @McAfeeclones wrote to McAfee that there was "[p]retty good movement in price on [ICO-2] today, [ICO-1] only a little bit. I'll work on promoting [it] more."

151.     In June 2018, McAfee requested another promotion of Token-2 by @McAfeeclones, as he held more than 14.5 million tokens obtained as a part of his illegal promotion of ICO-2.

152.     In total, McAfee sent 52 ETH (worth approximately $25,000) to @McAfeeclones between March 2018 and June 2018 in connection with these undisclosed promotional efforts, and @McAfeeclones did in fact promote Tokens-1 and 2.

153.     McAfee undertook other efforts to pump the remaining tokens from his ICO promotions. On May 24, 2018, McAfee tweeted: "McAfee Short Term Predictions," which listed McAfee's target prices for certain digital assets, including "[ICO-2] will hit $.52 by mid July." On May 23, Token-2's closing price was $0.089, but increased to $0.11 and then $0.15 in the next two days, continuing to rise until it peaked at $0.26 on June 3, before falling.

154.     McAfee did not disclose that he still held a position in these tokens and that he and others were secretly attempting to dump McAfee's ICO-2 digital assets at the time of this tweet.

**D.     McAfee Understood That His Conduct Was Illegal**

155.     From the outset McAfee knew or recklessly disregarded that his ICO promotions for undisclosed compensation were illegal.

156.     McAfee understood that his conduct was wrongful since at least June 2017, when he began working on the launch of at least two ICOs of his own and wrote to an employee in connection with one of these offerings that the ICO "can't be seen as an IPO [initial public offering]" because such a classification would have required the offerings to be registered with the SEC.

157.     At that time, McAfee closely followed developments in the regulatory space

concerning digital assets, and certain of his correspondents specifically warned him that certain

ICOs likely were securities offerings and that celebrities who promote ICOs without disclosing their

compensation may violate the federal securities laws. For example:

a.     On July 26, 2017, shortly after the Commission issued the DAO Report, one

of his employees (Employee-1) sent McAfee an article entitled, "Oh Shit, the SEC Just Ruled

That Ethereum ICO Tokens Are Securities," which had as its subheading, "Some ICOs

must be registered or they're unlawful."

b.     On November 2, 2017, the day after the Celebrity ICO Statement was issued,

McAfee also was explicitly warned by a correspondent via private Twitter DM about

potential regulatory issues when the correspondent noted that "I hope the SEC statement

about ICO doesn't negatively affect anything with McAfee coin," a token that McAfee had

been considering issuing under his own name.

158.     In December 2017, McAfee negotiated with another entity to provide it consulting

services. Their agreement, for which McAfee provided edits, provided that "taking a benefit of any

kind in exchange for writing . . . about a security or cryptocurrency could be a violation of law." The

agreement further prohibited scalping (a term defined below) in any form.

159.     On December 27, 2017, a correspondent proposed to McAfee that McAfee "buy the

dip" – i.e., buy a digital asset at a low price – and then endorse a token. He then texted McAfee that

"[i]f we don't pay you, you don't have to water down your endorsements by pointing [out that] you

are being paid as SEC required."

## III.     MCAFEE AND WATSON'S DIGITAL ASSET SCALPING SCHEME

160.     Scalping is an illegal scheme whereby someone (i) obtains securities for his own

account prior to recommending or touting it to others; (ii) does not disclose in the tout the complete

truth about his ownership of the securities and his plans to sell them; and (iii) proceeds to sell the securities following the tout's dissemination into the increased share price and trading volume generated by his tout. McAfee and Watson engaged in this type of conduct with respect to at least one digital asset: Token-8.

161.    McAfee knew that the recommendation of a digital asset security for purchase while simultaneously trying to offload a position in the digital asset was wrongful, just as he knew his undisclosed promotions were unlawful. In the December 2017 Interview, McAfee warned investors to view digital asset recommendations with suspicion because: "[Unscrupulous promoters] go, 'Oh, I love this one, or I love that one, and this looks great.' They don't know why they're saying it. Maybe they're saying it because they bought 100,000 coins and they can't sell them, right?"

162.    Nevertheless, between December 2017 and February 2018, McAfee and Watson identified digital assets, including the digital asset security Token-8, with respect to which they believed McAfee's Twitter promotions could move the market, accumulated large positions in those digital assets in McAfee's accounts, recommended the digital assets in tweets, and then dumped McAfee's holdings in a digital asset as the asset's price increased in response to the tweet.

163.    Starting in late 2017, McAfee announced that he would be tweeting a daily token recommendation. Ultimately, between December 21, 2017 and February 22, 2018, McAfee recommended at least 10 digital assets as his "Coin of the Day" (later "Coin of the Week").

164.    At the outset of this scheme, McAfee tweeted that "[m]ost of the 2,000 coins are trash or scams. I've read every white paper. The few I'm connected to I will tell you. The rest I have no position in. These coins will change the world. You can support that change."

165.    McAfee's claims that he would tell his followers when he had a position in a digital asset or that he had no position in these tokens were false, as he knew or recklessly disregarded.

166.     In advance of his market-moving tweets, McAfee had an employee purchase each token several days prior to the announcement and then sell out shortly after McAfee's tweet. McAfee closely followed the sales of the digital assets that his employees conducted and generally instructed his employees to sell the digital assets once the price had appreciated 30%.

167.     On December 20, 2017, Watson performed several Google searches about Token-8. Watson then discussed Token-8 with McAfee, who sent a Skype message two hours later to Employee-1 asking "[w]hat do you think of [Token-8?]"

168.     For the next two hours, Employee-1 sent messages to McAfee detailing his thoughts on the company and its token. Employee-1 wrote that he was unable to obtain critical information about the company, noting that he was unable to sign up for an account "to see what it even is," and that he was "fairly sure the white paper is stored next to the arc of the covenant in that Indiana jones warehouse." Nonetheless, the employee was able to glean some basic information on the company and the token from other sites and provided McAfee with a high level overview.

169.     On December 21, McAfee announced on his Twitter feed: "[Token-8] – the first of my daily coin reports" and attached a screenshot containing what purported to be his analysis of the company. In that purported analysis, McAfee made numerous positive claims about Token-8, including that "[a]t $0.08 it is seriously cheap," without disclosing that he had accumulated a position inToken-8 and planned to sell the tokens for a profit following his recommendation.

170.     McAfee knew or recklessly disregarded that his misleading Twitter promotions would affect the price of Token-8—indeed, he intended that very result.

        a.      For example, as Employee-1 explained to McAfee in a message: "we both know your name carries weight over there [in New Zealand, where Token-8 was traded on a digital asset platform] like no other . . . they are literally going to shit their pants when they wake-up tomorrow and see they just got a 500,000 endorsement equivalent" and "I think

your word (especially as far as spreading this platform to the united stated [sic] will be tremendous).”

b.    The interviewer during the January 2018 Interview similarly stated his belief that McAfee's tweets moved digital asset prices for already-trading tokens anywhere between 50 and 350%, and McAfee acknowledged in that interview that trading by bots on the tokens increased their “pump and dump potential.”

171.   Nearly all of the statements in McAfee's purported analysis of Token-8, posted on December 21, which were presented as McAfee's personal opinion and as if based on his careful review, were in fact taken almost verbatim from Employee-1's research, conducted without reviewing the company's white paper or looking at its website. Several of the claims were also false, such as that McAfee had purportedly reviewed numerous messages referring to Token-8 as “the holy grail of crypto”—a line that McAfee actually copied from his employee to further his scheme.

172.   Following his announcement regarding Token-8, McAfee falsely told a Twitter user that he did not own the token. The user asked where Token-8 could be purchased. McAfee referred the user to a New Zealand-based digital asset trading platform and stated: “You ask how I cannot know [where the token trades] - - I own no [Token-8]. I am not pumping for my gain. I am showing you the incredible value of supporting a coin that will change the world.”

173.   McAfee knew or recklessly disregarded that these statements were false or misleading when he made them because he was doing exactly that—pumping Token-8 for his own gain, with the undisclosed intention to sell it once he had sufficiently inflated its value.

174.   At the direction of McAfee, two members of his team had invested 4 BTC into Token-8 prior to the pump—the equivalent of roughly $70,000 at the time. The price of Token-8 rose 50% immediately after McAfee's tweet—from $0.08 to $0.12, before returning shortly after to

roughly $0.09—generating instant profits for McAfee and his team, which they realized by selling McAfee's Token-8 holdings on the New Zealand-based digital asset trading platform.

## IV.   WATSON'S ADDITIONAL ACTIONS WITH RESPECT TO THE SCHEMES

175.   Watson participated in and provided substantial knowing or reckless assistance to McAfee in connection with McAfee's ICO promotion and scalping schemes in additional ways to those described above.

176.   Watson triaged the requests from ICO issuers for promotion for McAfee's approval, and negotiated the terms of the undisclosed payments for promotions on McAfee's behalf. For example, in a January 2018 email, sent by Watson to himself, with the subject line "What to say," Watson wrote: "Mr. McAfee promotes ICOs for 25% of the ICO income plus a percentage of the coins. Please let us know if you are interested."

177.   To deceive investors into thinking McAfee was impartial, Watson instructed at least some of the Issuers conducting ICOs that McAfee was promoting not to indicate on their social media accounts or websites that McAfee was involved with their ICOs when McAfee first began tweeting about them.

178.   Watson also received deceptive proposed language for promotional tweets from the issuers, which he passed on to McAfee, who then included the language in his tweets. These tweets did not disclose that McAfee was being compensated for his posts.

179.   Watson had his then-wife convert digital asset proceeds from the touting and scalping schemes into fiat currency, send the funds to bank accounts he and McAfee controlled, and directed his then-wife to tweet fake interest in an ICO that McAfee was promoting to create a deceptive illusion of interest in that ICO.

180.   Watson received at least $316,000 in proceeds from the ICO touting scheme, and helped McAfee cash out the funds and digital asset securities McAfee was paid for his promotions.

181.    Watson also knew that the digital asset offerings McAfee promoted were securities offerings and that McAfee's conduct was illegal. For example, in January 2018, the CEO of an ICO issuer complained to Watson by text message that "I'm getting a bunch of grief about the Howey Test due to the SEC chairman's last rant about crypto" (referring to the Supreme Court's decision in *SEC v. W.J. Howey*, 328 U.S. 293 (1946), and, presumably, to a speech by the SEC's Chairman which can be found at https://www.sec.gov/news/speech/speech-clayton-012218), to which Watson replied, "Yeah it's a crazy world right now." Watson nevertheless continued to negotiate with the CEO and had McAfee tweet about its ICO for undisclosed compensation.

## V.    THE TOUTED ICOs AND TOKEN-8 WERE OFFERED AND SOLD AS INVESTMENT CONTRACTS AND WERE THEREFORE SECURITIES

182.    The digital assets offered and sold in the Touted ICOs and in ICO-8, were offered and sold as "investment contracts" and were therefore securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], because they were offered and sold to potential investors as an investment of money in a common enterprise with an expectation of profits to be generated from the efforts of the issuers and/or other third parties.

183.    The Touted ICOs and ICO-8 thus constituted offers and sales of securities.

184.    All of the issuers of the Touted ICOs and of ICO-8 accepted ETH in exchange for the tokens they were selling; ICO-1, ICO-3, ICO-7, and ICO-8 also accepted BTC; and ICO-3 and ICO-7 also accepted fiat currency. Each of these represents an investment of "money" for purposes of the determining the existence of an investment contract under the federal securities laws.

185.    Before and at the time of ICO-1 for Token-1:

a.    Issuer-1 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, referring to ICO participants as "investors," and

explaining that the company would determine how many tokens it would retain at the end of the crowdsale in part to "protect investors."

b.      ICO-1 investor assets were pooled to fund Issuer-1's business model and Issuer-1 reserved 35% of all Token-1s for itself.

c.      Issuer-1 touted its ongoing and promised future efforts to increase the value of Token-1, by stating, among other things, specific actions that the company intended to take following completion of the offering, including research and development; creating strategic partnerships and joint ventures; establishing data centers; and creating the platform. Issuer-1 also stated that a significant portion of the funds raised in ICO-1, totaling 55% of the token total value, would be allocated to these activities, among others.

d.      Issuer-1 emphasized to potential investors that Token-1 would be traded on digital asset trading platforms shortly after the end of the ICO-1, and specifically stated: "the exchanges will list [Token-1] end of February, after the ICO ends. We are discussing with all major exchanges currently."

186.   Before and at the time of ICO-2 for Token-2:

a.      Issuer-2 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, discussing the profit potential of Token-2 in public fora, including by stating: "I can't give any details about the price a token would be on exchanges. What [I] can tell you however is that spending 1btc gives you 2btc worth of tokens during presale. A smart move would be to keep all but if you are in for short term profits then you can always sell your bonus a get some return on investment . . . ."

b.      Investor assets were pooled to fund Issuer-2's business model and Issuer-2 disclosed that it had distributed 15% of all tokens to itself.

c.      Issuer-2 touted its ongoing and promised future efforts to increase the value of Token-2, by stating, among other things, specific actions that the Issuer-2 team intended to take following completion of the offering, including making technological improvements to the platform; marketing; user training; and establishing a token buyback program. Issuer-2 stated on its Twitter feed that "we're all workin' hard to make this a winner for all."

d.      Issuer-2 emphasized to potential investors that Token-2 would be traded on digital asset trading platforms shortly after the end of the ICO-2, specifically stating: "Yes [you can re-sell Token-2 right after purchasing in the ICO] . . . if you have a small list of investors . . . you can be very smart and scoop as many tokens during presale (100% bonus). . . . After presale the scarcity starts . . . . And price doubles . . . . You can then sell your bonus to your investors at crowdsale price . . . ."

187.    Before and at the time of ICO-3 for Token-3:

a.      Issuer-3 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, referring to ICO participants as "investors," and claiming that Token-3 represented a "profit sharing token that also has a utility aspect."

b.      The white paper for ICO-3 explained that the "[Token-3] is the investor's stake in [Issuer-3]. This ensures that the value of [Token-3] grows over time, as [Issuer-3] grows through the United States and internationally."

c.      Investor assets were pooled to fund Issuer-3's business model, including creating the platform for Token-3, and Issuer-3 disclosed that it has reserved 20% of all tokens for management and another 20% of the tokens for the company.

d.      Issuer-3 touted its ongoing and promised future efforts to increase the value of Token-3, by highlighting, among other things, the expertise of Issuer-3's team and the specific steps the company intended to take at the completion of the offering, including the

development of the platform, the recruitment of contractors, and the marketing of the company's services. Comments from investors in public fora made clear that these offering participants valued the experience of the team.

188.    Before and at the time of ICO-4 for Token-4:

      a.      Issuer-4 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, noting to potential investors in a public forum that "[s]econdary markets are very important for tokens, [Token-4] included," and that they "can't really go into detail about that subject otherwise I could get in trouble with the SEC."

      b.      Investor assets were pooled to fund Issuer-4's business model, and Issuer-4 disclosed that its founders and partners had retained 20% of all tokens.

      c.      Issuer-4 touted its ongoing and promised future efforts to increase the value of Token-4, by, among other things, touting the expertise of the company's team and its advisers, which included individuals who had "created some of the most successful horror movies in history."

      d.      Issuer-4 further explained that unsold tokens from the offering would be used by the company to attract additional talent and develop partnerships with individuals and companies to help Issuer-4 reach its goals.

      e.      Issuer-4 emphasized to potential investors that Token-4 would be traded on digital asset trading platforms shortly after the end of ICO-4.

189.    Before and at the time of ICO-5 for Token-5:

      a.      Issuer-5 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, touting the profit potential of Token-5 in public statements to potential investors. In a press release, Issuer-5 explained that "[Issuer-5] will introduce tokens ([Token-5]) for the platform that would give patrons voting rights and even

allow them to add songs to the playlists. The trading of those tokens is expected to drive up the cost of each [Token-5][,] which will create profits for early [ICO-5] investors." The company also noted that "[w]e are so confident in the success of the [ICO-5] because we see the explosion of profits that is already taking place."

      b.     Investor assets were pooled to fund Issuer-5's business model, and Issuer-5 disclosed that it had retained 15% of all tokens for the company.

      c.     Issuer-5 touted its ongoing and promised future efforts to increase the value of Token-5, by, among other things, touting the experience of its team and developers in public fora. Issuer-5's white paper also detailed specific tasks that would be completed by its team, and explained that the funds from the offering would be used to develop its platform, including developing a mobile app, licensing the company's services in the U.S. and overseas, developing content for the platform, and marketing the company.

      d.     Issuer-5 emphasized to potential investors that Token-5 would be traded on digital asset trading platforms shortly after the end of ICO-5, including stating in its public messaging forum that "there is a lot of room with price speculation."

190.    Before and at the time of ICO-6 for Token-6:

      a.     Issuer-6 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, touting the profit potential of Token-6 in public statements to potential investors. In its white paper, Issuer-6 emphasized that the finite number of tokens would naturally lead to investor profits: "as the crypto token network grows, there are more people circulating the crypto token, and the market forces of supply and demand cause the value of the crypto token to rise." Issuer-6 also emphasized the specific milestones the company hoped to achieve, as detailed in paragraph 190(c) below.

b.      Investor assets were pooled to fund Issuer-6's business model, and Issuer-6 disclosed that it had retained 20% of all tokens for the company.

c.      Issuer-6 touted its ongoing and promised future efforts to increase the value of Token-6, by, among other things, touting the experience of its team and developers in its white paper. The ICO-6 white paper also contained a roadmap detailing specific milestones that the company hoped to achieve in the year following the token sale, including a "design phase" for the platform, development of the actual platform, and testing the product.

d.      In its white paper, Issuer-6 explained that the funds collected in the token sale would be used to "fund [the company's] development," including the recruitment of software developers and hiring of a "growth marketer" to promote Issuer-6.

e.      Comments from investors in public fora made clear that these offering participants expected to profit from holding Token-6.

191.    Before and at the time of ICO-7 for Token-7:

a.      Issuer-7 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, touting the profit potential of Token-7 in public statements to potential investors. In the ICO-7 white paper Issuer-7 explained that "[t]he total number of tokens is strictly limited by the initial issue. Therefore, a deflationary economic model has been created within the framework of the platform. It provides an increase in the value of tokens over time." The company also claimed that "[w]e can't sleep until we make our investors rich."

b.      Investor assets were pooled to fund Issuer-7's business model and Issuer-7 disclosed that it had retained 10% of all tokens for the company.

c.      Issuer-7 touted its ongoing and promised future efforts to increase the value of Token-7, by, among other things, touting the expertise of its team and the support of its

"legendary advisers" as being critical to the company's success. Issuer-7's white paper also detailed discrete tasks that would be completed by its team, and explained that the funds from the offering would be used to develop the Token-7 platform; create "viral content" relating to the platform; and market the product.

192.     Before and at the time of ICO-8 for Token-8:

a.       Issuer-8 led prospective investors to reasonably expect profits based on the efforts of others by, among other things, touting the profit potential of Token-8 in public statements. In its white paper, Issuer-8 answered the question of "[w]hy would someone invest in [ICO-8]?" by stating that Token-8 would have "great appeal for: Long-term holders. Those who wish to buy and hold [Token-8] for any potential future value."

b.       Investor assets were pooled to fund Issuer-8's business model, and Issuer-8 disclosed that it had retained 20 million tokens for the company.

c.       Issuer-8 touted its ongoing and promised future efforts to increase the value of Token-8, by, among other things, detailing various milestones the company hoped to achieve, including integration of a global SMS message system to the app; international promotion of the product; global translation of the app; and development of a "GUI CPU miner." The ICO-8 white paper further explained that "[a] team will be concurrently building the virtual currency exchange app . . ." Comments from investors in public fora made clear that they were relying on Issuer-8 to undertake efforts to further develop the platform and thereby increase the price of Token-8.

d.       At the time of ICO-8, the platform for which Issuer-8 stated it was raising funds in ICO-8 to develop was still in development. Issuer-8 explained that "we are raising money in this token sale for a more ambitious plan," with the "scope of our long terms goals . . . largely defined by the funds raised in the crowdfunding token sale."

e.      Issuer-8 emphasized to potential investors that Token-8 would be traded on digital asset trading platforms shortly after the end of ICO-8, including stating in its white paper that "[w]e are allowing people a chance to purchase [Token-8] in advance of it being listed on the various exchanges." The company further explained that Token-8 would be available to token sale participants—whom the company described as "investors"—before they were made available to the general public.

193.    Moreover, before and at the time of each of the seven Touted ICOs and the ICO for Token-8, there was no consumptive "use" for <u>any</u> of the eight tokens being offered in the particular ICOs, and the platforms for which the eight issuers stated they were raising funds to develop had not been developed or were still in development.

194.    McAfee acted knowingly, or at the least recklessly, in connection with the conduct set forth above, and also acted negligently, by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

195.    Watson acted knowingly, or at the least recklessly, in connection with the conduct set forth above, and also acted negligently, by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (Against McAfee)

196.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 194.

197.    By engaging in the acts and conduct described in this Complaint, Defendant McAfee made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer securities

(the digital asset securities Tokens-1 through 7) for sale, described such securities for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

198.    McAfee (acting individually and/or through his agents) violated Section 17(b) of the Securities Act by, among other things, directly or indirectly, publishing communications on Twitter and other publicly available fora, describing Tokens-1 through 7, all digital asset securities, in exchange for compensation in the form of various digital assets, without fully disclosing the past and/or intended receipt of such consideration and the amount thereof.

199.    By reason of the conduct described above, McAfee violated and, unless enjoined will again violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a)(1) and (3) of the Securities Act**
**(Against McAfee and Watson)**

200.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 195.

201.    By engaging in the acts and conduct described in this Complaint, Defendants McAfee and Watson, directly or indirectly, singly or in concert, in the offer or sale of securities (the digital asset securities Tokens-1 through 8), and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

202.    McAfee (acting individually and/or through his agents) violated Sections 17(a)(1) and (a)(3) of the Securities Act by, among other things, directly or indirectly, with scienter: taking affirmative steps to conceal, and/or deceive investors respecting, his receipt of compensation for his

promotional communications regarding the digital asset securities offered and sold in ICOs-1 through 7; directing and overseeing the work of his agents to coordinate and carry out the promotional campaigns; and directing certain issuers of the digital assets securities offered and sold in ICOs-1 through 7 to mislead, and himself misleading, the public about his involvement with such issuers. McAfee's intentional or reckless failure to make timely and appropriate disclosure of the compensation he was receiving for making promotional communications with respect to ICOs-1 through 7, as well as his intentional or reckless misstatements about the nature of his involvement with certain issuers of such securities, the reasons he was promoting certain such securities, and the nature of his own investments into such securities, violated Sections 17(a)(1) and (a)(3) of the Securities Act as material misstatements and omissions that facilitated McAfee's scheme to deceive investors about his compensation for promoting the digital asset securities offered and sold with respect to ICOs-1 through 7, and/or to fraudulently induce investors to purchase the digital asset securities being offered in ICOs-1 through 7. McAfee also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. With respect to the digital asset securities Token-1 and Token-2, McAfee further violated Sections 17(a)(1) and (a)(3) of the Securities Act by engaging others to make public statements about such securities designed to facilitate McAfee's and others' sales into the market of such securities at higher prices, and by himself making such sales into the market. McAfee also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. With respect to the digital asset security Token-8, McAfee further violated Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly purchasing, or directing others to purchase, such security for his own account prior to recommending or touting that very security to others, while not disclosing the full details of his ownership of Token-8 and his plans to sell it, and selling Token-8 following the tout's

dissemination and into the share price and trading volume increases triggered by the tout. McAfee also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

203.    Watson, pursuant to a tacit or explicit agreement with McAfee, violated Sections 17(a)(1) and (a)(3) of the Securities Act by, knowingly or recklessly, among other things, directly or indirectly, with scienter: taking affirmative steps to conceal, and/or deceive investors respecting, McAfee's receipt of compensation for McAfee's promotional communications regarding the digital asset securities offered and sold in ICOs-1 and 3 through 7; directing certain issuers of the digital assets securities offered and sold in ICOs-1 and 3 through 7 to mislead the public about his involvement with such issuers; directing others to issue public statements intended to create the false appearance of interest in certain such securities; identifying potential digital asset securities that could become a part of the ICO promotional scheme; and communicating with and directing the issuers of the digital asset securities offered and sold in ICOs-1 and 3 through 7, respecting such scheme. Watson also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. Watson also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances. With respect to the digital asset security Token-8, Watson further violated Sections 17(a)(1) and (a)(3) of the Securities Act by knowingly or recklessly identifying such security for McAfee's account prior to taking steps to procure the touting of that very security to others, while not disclosing the full details of McAfee's ownership of Token-8 and his plans to sell it, and taking steps to procure McAfee selling Token-8 following the tout's dissemination and into the share price and trading volume increases triggered by the tout. Watson also violated Section 17(a)(3) of the Securities Act by failing to use the degree of care in this conduct that a reasonably careful person would use under like circumstances.

204.     By reason of the foregoing, Defendants McAfee and Watson, directly or indirectly,

singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section

17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

### THIRD CLAIM FOR RELIEF
### Violations Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder
### (Against McAfee and Watson)

205.     The Commission realleges and incorporates by reference here the allegations in

paragraphs 1 through 195.

206.     By engaging in the acts and conduct described in this Complaint, Defendants

McAfee and Watson, directly or indirectly, singly or in concert, in connection with the purchase or

sale of securities, the digital asset securities Tokens-1 through 8, and by the use of means or

instrumentalities of interstate commerce, or the mails, or the facilities of a national securities

exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to

defraud, and/or (2) engaged in one or more acts, practices, or courses of business which operated or

would operate as a fraud or deceit upon other persons.

207.     McAfee (acting individually and/or through his agents) violated Section 10b-5 of the

Exchange Act, and Rules 10b-5(a) and (c) thereunder, by, among other things, directly or indirectly:

taking affirmative steps to conceal, and/or deceive investors respecting, his receipt of compensation

for his promotional communications regarding the digital asset securities offered and sold in ICOs-1

through 7; and directing certain issuers of the digital assets securities offered and sold in ICOs-1

through 7 to mislead, and himself misleading, the public about his involvement with such issuers.

McAfee's intentional or reckless failure to make timely and appropriate disclosure of the

compensation he was receiving for making promotional communications with respect to ICOs-1

through 7, as well as his intentional or reckless misstatements about the nature of his involvement

with certain issuers of such securities, the reasons he was promoting certain such securities, and the

nature of his own investments into such securities, violated Section 10b-5 of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, as material misstatements and omissions that facilitated McAfee's scheme to deceive investors about his compensation for promoting the digital asset securities offered and sold with respect to ICOs-1 through 7, and/or to fraudulently induce investors to purchase the digital asset securities being offered in ICOs-1 through 7. With respect to the digital asset securities Token-1 and Token-2, McAfee further violated Section 10b-5 of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, by knowingly or recklessly engaging others to make public statements about such securities designed to facilitate McAfee's and others' sales into the market of such securities at higher prices, and by himself making such sales into the market. With respect to the digital asset security Token-8, McAfee further violated Section 10b-5 of the Exchange Act, and Rules 10b-5(a) and (c) thereunder, by knowingly or recklessly purchasing, or directing others to purchase, such security for his own account prior to recommending or touting that very security to others, while not disclosing the full details of his ownership of Token-8 and his plans to sell it, and selling Token-8 following the tout's dissemination and into the share price and trading volume increases triggered by the tout.

208.    Watson, pursuant to a tacit or illicit agreement with McAfee, violated Section 10b-5 of the Exchange Act, and Rules 10b-5(a) and (c) thereunder by, among other things, directly or indirectly, with scienter: taking affirmative steps to conceal, and/or deceive investors respecting, McAfee's receipt of compensation for McAfee's promotional communications regarding the digital asset securities offered and sold in ICOs-1 and 3 through 7; directing certain issuers of the digital assets securities offered and sold in ICOs-1 and 3 through 7 to mislead the public about his involvement with such issuers; directing others to issue public statements intended to create the false appearance of interest in certain such securities; identifying potential digital asset securities, and the issuers of such securities, that could become a part of the ICO promotional scheme; and

communicating with and directing the issuers of the digital asset securities offered and sold in ICOs-1 and 3 through 7, respecting such scheme. With respect to the digital asset security Token-8, Watson further violated Section 10b-5 of the Exchange Act, and Rules 10b-5(a) and (c) thereunder by knowingly or recklessly identifying then purchasing such security for McAfee's account prior to taking steps to procure the touting of that very security to others, while not disclosing the full details of McAfee's ownership of Token-8 and his plans to sell it, and taking steps to procure McAfee selling Token-8 following the tout's dissemination and into the share price and trading volume increases triggered by the tout.

209.    By reason of the foregoing, McAfee and Watson, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
#### Violations of Section 17(a)(2) of the Securities Act
#### (Against McAfee)

210.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 194.

211.    McAfee, directly or indirectly, singly or in concert, in the offer or sale of securities, the digital asset securities Tokens-1 through 8, and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

212.    McAfee violated Section 17(a)(2) of the Securities Act by, among other things, knowingly, recklessly, or negligently making material misstatements, in public fora such as Twitter and others, regarding the reasons and sources for his promotions of certain ICOs (including that he

had "scoured" or "sift[ed]" through other tokens to recommend certain ICOs), his supposed

involvement with the issuers of such ICOs (including that he was a "friend" of or "adviser" to the

issuers of certain ICOs), his investments in the digital assets securities being offered and sold in such

ICOs (including that he had invested in certain of the ICOs), and the amount and extent of his

compensation the issuers of such ICOs had paid him to promote such ICOs (including that he was

not being paid to promote the ICOs), and omitted to disclose material information regarding the

amount and extent of compensation the issuers of the ICOs for Tokens-1 through 7 had paid him in

exchange for promotional materials. With respect to the digital asset security Token-8, McAfee

further violated Section 17(a)(2) of the Securities Act by, among other things, knowingly or

recklessly making material misstatements and omissions, in public fora such as Twitter and others,

regarding his holdings of Token-8 and his intent to sell his holdings of Token-8 following the tokens

price appreciation he expected to be caused by his promotion of the token.

213.    By reason of the foregoing, McAfee, directly or indirectly, singly or in concert,

violated and, unless enjoined, will again violate Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

### FIFTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against McAfee)

214.    The Commission realleges and incorporates by reference here the allegations in

paragraphs 1 through 194.

215.    McAfee, directly or indirectly, singly or in concert, in connection with the purchase

or sale of securities, the digital asset securities Tokens-1 through 8, and by the use of means or

instrumentalities of interstate commerce, or the mails, or the facilities of a national securities

exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted

to state one or more material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

216.     McAfee violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly making material misstatements and omissions, in public fora such as Twitter and others, regarding the reasons and sources for his promotions of certain ICOs (including that he had "scoured" or "sift[ed]" through other tokens to recommend certain ICOs), his supposed involvement with the issuers of such ICOs (including that he was a "friend" of or "adviser" to the issuers of certain ICOs), his investments in the digital assets securities being offered and sold in such ICOs (including that he had invested in certain of the ICOs), and the amount and extent of his compensation the issuers of such ICOs had paid him to promote such ICOs (including that he was not being paid to promote the ICOs), and omitted to disclose material information regarding the amount and extent of compensation the issuers of the ICOs for Tokens-1 through 7 had paid him in exchange for promotional materials.  With respect to the digital asset security Token-8, McAfee further violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder by, among other things, knowingly or recklessly making material misstatements and omissions, in public fora such as Twitter and others, regarding his holdings of Token-8 and his intent to sell his holdings of Token-8 following the tokens price appreciation he expected to be caused by his promotion of the token.

217.     By reason of the foregoing, McAfee, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)
### (Against Watson)

218.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 195.

219.     By engaging in the acts and conduct described in this Complaint, Defendant Watson,

directly or indirectly, provided knowing or reckless and substantial assistance to McAfee, who,

directly or indirectly, singly or in concert with others, in the offer or sale of securities, the digital

asset securities Tokens-1 through 8, used the means or instruments of transportation or

communication in interstate commerce or used the mails to: (a) with scienter employed devices

schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon

purchasers of such securities; and who, directly or indirectly, acting singly or in concert with others,

in the offer or sale of securities, the digital asset securities Tokens-1 through 8, knowingly, recklessly,

or negligently obtained money or property by means of one or more untrue statements of a material

fact or omissions of a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

220.     Watson knowingly or recklessly provided substantial assistance to McAfee's

violations of Section 17(a) of the Securities Act, as alleged in the Second and Fourth Claims for

Relief above, by, among other things, helping conceal from and/or deceive investors respecting

McAfee's receipt of compensation for McAfee's promotional communications regarding the digital

asset securities offered and sold in ICOs-1 and 3 through 7; directing certain issuers of the digital

assets securities offered and sold in ICOs-1 and 3 through 7 to mislead the public about his

involvement with such issuers; directing others to issue public statements intended to create the false

appearance of interest in certain such securities; identifying potential digital asset securities that

could become a part of the ICO promotional scheme; communicating with and directing the issuers

of the digital asset securities offered and sold in ICOs-1 and 3 through 7, respecting such scheme;

engaging others to make public statements about Token-8 in order to facilitate McAfee's and others'

sales into the market of such securities at higher prices; taking steps to procure the touting of that

very security to others, while not disclosing the full details of McAfee's ownership of Token-8 and his plans to sell it; and taking steps to procure McAfee selling Token-8 following the tout's dissemination and into the share price and trading volume increases triggered by the tout.

221.    By reason of the foregoing, Watson is liable pursuant to Section 15(b) [15 U.S.C. § 77o(b)] of the Securities Act for aiding and abetting McAfee's violations of Section 17(a) of the Securities [15 U.S.C. § 77q(a)] and, unless enjoined, Watson will again aid and abet violations of these provisions.

**SEVENTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Securities Act Section 17(b)**
**(Against Watson)**

222.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 195.

223.    By engaging in the acts and conduct described in this Complaint, Defendant Watson, directly or indirectly, provided knowing and substantial assistance to McAfee, who, directly or indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer securities (the digital asset securities Tokens-1 and 3 through 7) for sale, describes such securities for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

224.    Watson knowingly or recklessly provided substantial assistance to McAfee's violations of Section 17(b) of the Securities Act, as alleged in the First Claim for Relief above, by, among other things, helping conceal from and/or deceive investors respecting McAfee's receipt of compensation for McAfee's promotional communications regarding the digital asset securities

offered and sold in ICOs-1, and 3 through 7; directing certain issuers of the digital assets securities offered and sold in ICOs-1, and 3 through 7 to mislead the public about his involvement with such issuers; directing others to issue public statements intended to create the false appearance of interest in certain such securities; identifying potential digital asset securities, and the issuers of such securities, that could become a part of the ICO promotional scheme; and communicating with and directing the issuers of the digital asset securities offered and sold in ICOs-1, and 3 through 7, respecting such scheme.

225.    By reason of the foregoing, Watson is liable pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] for aiding and abetting McAfee's violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] and, unless enjoined, Watson will again aid and abet violations of these provisions.

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5
### (Against Watson)

226.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 195.

227.    By engaging in the acts and conduct described in this Complaint, Defendant Watson, directly or indirectly, provided knowing and substantial assistance to McAfee, who, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, the digital asset securities Tokens-1 and 3 through 7, and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, (1) employed one or more devices, schemes, or artifices to defraud; (2) knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

228.     Watson knowingly or recklessly provided substantial assistance to McAfee with respect to its violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, as alleged in the Third and Fifth Claims for Relief above, by, among other things, knowingly or recklessly helping conceal from and/or deceive investors respecting McAfee's receipt of compensation for McAfee's promotional communications regarding the digital asset securities offered and sold in ICOs-1 and 3 through 7; directing certain issuers of the digital assets securities offered and sold in ICOs-1 and 3 through 7 to mislead the public about his involvement with such issuers; directing others to issue public statements intended to create the false appearance of interest in certain such securities; identifying potential digital asset securities, and the issuers of such securities, that could become a part of the ICO promotional scheme; and communicating with and directing the issuers of the digital asset securities offered and sold in ICOs-1 and 3 through 7, respecting such scheme.

229.     By reason of the foregoing, Watson is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting McAfee's violations of Section 10(b)of the Exchange [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Watson will again aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly,

Securities Act Sections 17(a) and 17(b) [15 U.S.C. § 77q(a)-(b)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

## III.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## IV.

Permanently prohibiting McAfee from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78*l*] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## V.

Prohibiting Defendants from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any digital asset security;

## VI.

A trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure; and

## VII.

Granting any other and further relief that may be appropriate and necessary for the benefit of investors.

Dated:  New York, New York
          October 5, 2020

_Richard R. Best_

RICHARD BEST
REGIONAL DIRECTOR
A. Kristina Littman
John O. Enright
Jorge G. Tenreiro
David H. Tutor
Jon A. Daniels
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov